# STATE OF MICHIGAN

# COURT OF APPEALS

MOTOR CITY PAWN BROKERS, INC.,

        Plaintiff-Appellant,

v

CITY OF WARREN,

        Defendant-Appellee.

UNPUBLISHED
December 17, 2015

No. 322459
Macomb Circuit Court
LC No. 12-002472-CZ

Before: JANSEN, P.J., and CAVANAGH and GLEICHER, JJ.

PER CURIAM.

Plaintiff, Motor City Pawn Brokers, Inc., brought this action against defendant, city of Warren, to enjoin the city from implementing a local ordinance (the "LeadsOnline ordinance") that would require pawnbrokers to submit electronic transaction reports to a private third-party vendor, LeadsOnline. The trial court rejected plaintiff's arguments that the LeadsOnline ordinance was preempted by, or otherwise violated, various state and federal statutes, and therefore granted defendant's motion for summary disposition. Plaintiff appeals as of right. We affirm.

## I. FACTS AND PROCEEDINGS

Plaintiff is a licensed pawnbroker operating in the city of Warren. The Michigan pawnbrokers act, MCL 446.201 *et seq.*, requires licensed pawnbrokers to record all transactions, including customer names, addresses, driver's license or other identification number, and the article sold or pledged to secure a loan. The statute further requires pawnbrokers to submit a copy of the transaction records to the local police agency. MCL 446.205. Since 2008, defendant has required electronic submission of transaction records. In 2012, defendant enacted an ordinance requiring these records to be submitted to LeadsOnline, L.L.C., a private company that operates a database of pawn transactions and transactions in secondhand goods. LeadsOnline acts as an agent for law enforcement agencies by receiving and compiling the transaction reports. The database is accessible only to member law enforcement agencies. The LeadsOnline ordinance was enacted in conjunction with approval of an agency agreement between defendant's police department and LeadsOnline.

Plaintiff brought this action for injunctive and declaratory relief, seeking to enjoin enforcement of the LeadsOnline ordinance on the ground that it violated the Gramm-Leach-Bliley Financial Services Modernization Act of 1999 (FSMA), 15 USC 6801 *et seq.*, the federal

-1-

Fair Credit Reporting Act (FCRA), 15 USC 1681 *et seq.*, the Michigan interstate law enforcement intelligence organizations act (ILEIOA), MCL 752.1 *et seq.*, and the Headlee Amendment, Const 1963, art 9, § 31. The trial court granted defendant's motion for summary disposition, finding that the LeadsOnline ordinance did not violate any state or federal laws.

## II. STANDARD OF REVIEW

Defendant moved for summary disposition under both MCR 2116(C)(8) and (10). Although the trial court did not specify under which subrule it granted defendant's motion, a motion under subrule (C)(8) is limited to the pleadings, *Maiden v Rozwood*, 461 Mich 109, 119-120; 597 NW2d 817 (1999), but the record discloses that defendant submitted documentary evidence in support of its motion and the trial court considered that evidence in deciding that summary disposition was warranted. Accordingly, defendant's motion is appropriately reviewed under subrule (C)(10). "In general, MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law." *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013). "A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact." *Id.* Questions of statutory interpretation are reviewed de novo. *Krusac v Covenant Med Ctr, Inc*, 497 Mich 251, 255-256; 865 NW2d 908 (2015).

## III. THE FMSA

Plaintiff argues that the trial court erred in concluding that the LeadsOnline ordinance was not preempted by the FSMA, which governs financial institutions' disclosures of nonpublic personal information. We disagree.

" ' "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." ' " *Ter Beek v City of Wyoming*, 495 Mich 1, 10; 846 NW2d 531 (2014), quoting *Wyeth v Levine*, 555 US 555, 565; 129 S Ct 1187; 173 L Ed 2d 51 (2009), in turn quoting *Medtronic, Inc v Lohr*, 518 US 470, 485; 116 S Ct 2240; 135 L Ed 2d 700 (1996). "In all preemption cases, . . . [a court starts] with the assumption that the historic powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Ter Beek*, 495 Mich at 10 (citations omitted).

Plaintiff contends that FSMA preempts the LeadsOnline ordinance. In resolving questions of statutory interpretation, this Court's goal is "to give effect to the Legislature's intent, focusing first on the statute's plain language." *Krusac*, 497 Mich at 256. "When the language of a statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written." *Id.*

15 USC 6802 provides, in pertinent part:

(a) Notice requirements

Except as otherwise provided in this subchapter, a financial institution may not, directly or through any affiliate, disclose to a nonaffiliated third party

any nonpublic personal information, unless such financial institution provides or has provided to the consumer a notice that complies with section 6803 of this title.

(b)  Opt out

(1) In general

A financial institution may not disclose nonpublic personal information to a nonaffiliated third party unless-

(A) such financial institution clearly and conspicuously discloses to the consumer . . . that such information may be disclosed to such third party;

(B) the consumer is given the opportunity, before the time that such information is initially disclosed, to direct that such information not be disclosed to such third party; and

(C) the consumer is given an explanation of how the consumer can exercise that nondisclosure option.

(2) Exception

This subsection shall not prevent a financial institution from providing nonpublic personal information to a nonaffiliated third party to perform services for or functions on behalf of the financial institution, including marketing of the financial institution's own products or services, or financial products or services offered pursuant to joint agreements between two or more financial institutions that comply with the requirements imposed by the regulations prescribed under section 6804 of this title, if the financial institution fully discloses the providing of such information and enters into a contractual agreement with the third party that requires the third party to maintain the confidentiality of such information.

* * *

(e)  Subsections (a) and (b) of this section shall not prohibit the disclosure of nonpublic information—

(1) as necessary to effect, administer, or enforce a transaction requested or authorized by the consumer, or in connection with—

(A) servicing or processing a financial product or service requested or authorized by the consumer;

* * *

(5) to the extent specifically permitted or required under other provisions of law and in accordance with the Right to Financial Privacy Act of 1978 [12 USCA 3401 *et seq.*], to law enforcement agencies (including the Bureau of

Consumer Financial Protection a Federal functional regulator, the Secretary of the Treasury with respect to subchapter II of chapter 53 of Title 31, and chapter 2 of Title I of Public Law 91-508 (12 USC 1951-1959), a State insurance authority or the Federal Trade Commission), self-regulatory organizations, or for an investigation on a matter related to public safety;

* * *

(8) to comply with Federal, State, or local laws, rules, and other applicable legal requirements; to comply with a properly authorized civil, criminal, or regulatory investigation or subpoena or summons by Federal, State, or local authorities; or to respond to judicial process or government regulatory authorities having jurisdiction over the financial institution for examination, compliance, or other purposes as authorized by law.

15 USC 6807 provides:

(a) In general

This subchapter and the amendments made to this subchapter shall not be construed as superseding, altering, or affecting any statute, regulation, order, or interpretation in effect in any State, except to the extent that such statute, regulation, order, or interpretation is inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency.

(b) Greater protection under State law

For purposes of this section, a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this subchapter if the protection such statute, regulation, order, or interpretation affords any person is greater than the protection provided under this subchapter and the amendments made by this subchapter, as determined by the Bureau of Consumer Financial Protection, after consultation with the agency or authority with jurisdiction under section 6805(a) of this title of either the person that initiated the complaint or that is the subject of the complaint, on its own motion or upon the petition of any interested party.

In assessing whether the LeadsOnline ordinance is preempted by the FSMA, we must determine whether there is a conflict between the two acts such that they cannot consistently stand together. See *Ter Beek*, 495 Mich at 11. In the context of this case, the relevant inquiry is whether the LeadsOnline ordinance impermissibly lowers the protection granted to consumers.

The first issue to be addressed is whether a pawnbroker is a financial institution within the meaning of the FSMA. 15 USC 6809(3)(A) defines "financial institution" to mean "any institution the business of which is engaging in financial activities as described in section 1843(k) of Title 12." 12 USC 1843(k)(4)(A) includes "[l]ending, exchanging, transferring, investing for others, or safeguarding money or securities." Michigan's pawnbroker act defines "pawnbroker" as "a person, corporation, or member . . . who loans money on deposit, or pledge

of personal property, or other valuable thing, other than securities or printed evidence of indebtedness, or who deals in the purchasing of personal property or other valuable thing on condition of selling the same back again at a stipulated price." MCL 446.203(e). Loaning money on pledge of personal property is a form of lending as stated in 12 USC 1843(k)(4)(A). Therefore, a pawnbroker qualifies as a financial institution within the meaning of the FSMA.

The trial court determined that the information transmitted to LeadsOnline was not "nonpublic personal information" within the meaning of 15 USC 6802(a). 15 USC 6809(4) provides:

> (A) The term "nonpublic personal information" means personally identifiable financial information—
>
> (*i*) provided by a consumer to a financial institution;
>
> (*ii*) resulting from any transaction with the consumer or any service performed for the consumer; or
>
> (*iii*) otherwise obtained by the financial institution.
>
> (B) Such term does not include publicly available information, as such term is defined by the regulations prescribed under section 6804 of this title.
>
> (C) Notwithstanding subparagraph (B), such term—
>
> (*i*) shall include any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any nonpublic personal information other than publicly available information; but
>
> (*ii*) shall not include any list description, or other grouping of consumers (and publicly available information pertaining to them) that is derived without using any nonpublic personal information.

The trial court relied on MCL 446.205(1), which requires pawnbrokers to keep a record of every "article of personal property or other valuable thing by way of pawn" it receives. The record must include "a description of the article, a sequential transaction number, any amount of money loaned on the article, the name, residence, general description, and driver license number, official state personal identification card number, or government identification number of the person from whom the article was received, and the day and hour when the article was received." MCL 446.205(1). These records are "subject to examination at any time by the attorney of the governmental unit, local police agency" or county prosecutor and state police. MCL 446.205(1). The pawnbroker is required to make a permanent record in duplicate. MCL 446.205(2). The pawnbroker must send one copy of the record to the local police agency. MCL 446.205(3). The trial court determined that a pawn transaction "inherently involves public information" because the customer implicitly agrees to provide this information when he participates in the transaction. We disagree with that conclusion because the information is not made available to the public, but received and kept by the pawnbroker and the law enforcement agency. Moreover, the FSMA defines the term "nonpublic personal information" to include financial information "resulting

-5-

from any transaction with the consumer." 15 USC 6809(4)(A). The information required by the state pawnbroker statute includes the amount paid or loaned to the consumer. This is clearly financial information within the meaning of the FSMA.

However, we agree with the trial court's further conclusion that the reports to LeadsOnline fall within the exception prescribed in 15 USC 6802(e)(1)(A), which applies to "disclosure of nonpublic information—as necessary to effect, administer, or enforce a transaction requested or authorized by the consumer, or in connection with—servicing a financial product or service requested or authorized by the consumer." The disclosure of nonpublic information in a pawn transaction is "necessary" to "service[e] or process[] a financial product or service requested or authorized by the consumer." Pawning items to obtain a loan and selling items are entirely voluntary acts by the consumer, and providing information about the items is necessary to effect the transaction under the Michigan pawnbrokers act, MCL 446.205. Although plaintiff argues that LeadsOnline is not servicing or processing loans, such as by collecting installment payments or managing tax and insurance escrow accounts, the statutory language does not restrict the exception to specific services. Rather, the exception applies "as is necessary to effect, administer, or enforce a transaction requested or authorized by the consumer, or in connection with –(A) servicing or processing a . . . service requested . . . by the consumer." Reporting the transaction to a law enforcement agency or its designated agent is necessary to effect and administer the transaction requested or authorized by the pawnbroker's customer. 15 USC 6804 authorizes the Bureau of Consumer Financial Protection and the Securities and Exchange Commission to promulgate "such regulations as may be necessary to carry out the purposes of this subchapter with respect to financial institutions and other persons subject to their respective jurisdiction. . . ." 12 CFR 1016.14 provides, in pertinent part:

> (a) Exceptions for processing transactions at consumer's request. The requirements for initial notice . . . , for the opt out . . . do not apply if you disclose nonpublic personal information as necessary to effect, administer, or enforce a transaction that a consumer requests or authorizes, or in connection with:

> (1) Servicing or processing a financial product or service that a consumer requests or authorizes;

> * * *

> (b) Necessary to effect, administer, or enforce a transaction means that the disclosure is:

> * * *

> (2) Required, or is a usual, appropriate or acceptable method:

> (*i*) To carry out the transaction or the product or service business of which the transaction is a part, and record, service, or maintain the consumer's account in the ordinary course of providing the financial service or financial product . . . .

Reporting pawn transactions to the local law enforcement agency is a "usual" method for "carryi[ng] out the transaction . . . in the ordinary course of providing the financial service . . . ."

Because the exception prescribed in § 6802(e)(1)(A) applies, it is unnecessary to analyze subsections (e)(5) and (8).

Returning to plaintiff's original question, whether the LeadsOnline ordinance is preempted by 15 USC 6807, we conclude that it is not. 15 USC 6807(a) provides that state and local laws that are inconsistent with the FSMA and which provide a lesser degree of consumer protection than the FSMA, are superseded by the FSMA. The LeadsOnline ordinance requires disclosure of consumer financial information to an entity designated as the agent of the Warren Police Department, in accordance with a provision of the Michigan pawnbrokers act, MCL 446.205, requiring licensed pawnbrokers to report consumer transactions to the local police agency. Because this disclosure is necessary to complete the transaction requested by the consumer, it comes within the exception to nondisclosure provided by § 6802(e)(1)(A). Accordingly, the LeadsOnline ordinance does not provide less protection to consumers than required by the FSMA, and the LeadsOnline reporting procedure does not violate the FSMA.

## IV. THE ILEIOA

Plaintiff argues that LeadsOnline is an interstate law enforcement intelligence organization within the meaning of the ILEIOA, and that the police department's participation in the LeadsOnline program is therefore illegal. We disagree.

MCL 752.1(d) defines "interstate law enforcement intelligence organization" as

any intelligence gathering organization whose purpose is to promote the gathering, recording, and interstate exchange of confidential information not available through regular police channels and which provides a central clearinghouse for information dissemination to its membership. Interstate law enforcement intelligence organization includes, but is not limited to, the intelligence gathering organization registered as a charitable trust in the state of California with its principal offices located in Sacramento, California.

MCL 752.2 provides:

A law enforcement agency may not supply information to or maintain files supplied by an interstate law enforcement intelligence organization unless 1 of the following conditions is met:

(a) The organization is the El Paso intelligence center.

(b) The interstate law enforcement intelligence organization is established by an act of congress.

(c) The interstate law enforcement intelligence organization is established within a federal investigative agency and membership is with the concurrence of the governor of this state.

(d) The interstate law enforcement intelligence organization is created by an act of the legislature in the state where the organization is located and by the legislature of this state.

MCL 752.3 provides:

(1) Except as provided in section 2, a law enforcement agency shall not maintain membership, supply information to, or maintain files supplied by an interstate law enforcement intelligence organization unless all of the following conditions are met by the interstate law enforcement intelligence organization:

(a) The organization is governed by a citizen oversight body which has the authority to periodically review the files maintained by the organization.

(b) The files maintained by an organization are relevant to a criminal investigation or pertinent to and within the scope of an authorized law enforcement activity.

(c) The organization does not maintain a record describing how an individual exercises rights guaranteed by the first amendment of the constitution of the United States.

(d) The organization has established guidelines which provide for the review of files at regular intervals to insure the accuracy and legality of the file information.

(e) The organization has established guidelines which provide for the destruction of outdated or inaccurate information.

(f) The organization permits its files located in a state with a freedom of information act to be accessible to the public in accordance with that act.

To qualify as an interstate law enforcement intelligence organization within the meaning of this statute, the organization must meet the following requirements: (1) the organization gathers intelligence; (2) the organization's purpose in gathering information is to promote the gathering, recording, and interstate exchange of information; (3) the information gathered is confidential information not available through regular police channels; and (4) the organization provides a central clearinghouse for information dissemination to its members. We agree that the first, second, and fourth elements are satisfied. LeadsOnline gathers information on pawn transactions, for the purpose of facilitating the exchange of this information, and it acts as a central clearinghouse for its law enforcement members. However, the third requirement is not satisfied. Information on pawn transactions is information available through regular police channels. Before joining LeadsOnline, defendant's police department and other law enforcement agencies exchanged information among themselves. There is no evidence that LeadsOnline provides to its members information that its members could not have obtained through regular channels among themselves. Plaintiff argues that the information is not exchanged through regular police channels because the LeadsOnline ordinance requires pawnbrokers to electronically submit the reports directly to LeadsOnline. However, the statutory definition

states that the information involved is "not *available* through regular police channels," not that the information is not transmitted or exchanged through those channels. Accordingly, LeadsOnline is not an interstate law enforcement intelligence organization within the meaning of the ILEIOA.

## V. THE HEADLEE AMENDMENT

Plaintiff argues that the surcharge assessed pursuant to the LeadsOnline ordinance is a local tax imposed in violation of the Headlee Amendment. The issue whether the surcharge is a tax subject to the Headlee Amendment or a permissible user fee is a question of law that we review de novo. *Mapleview Estates, Inc v City of Brown City*, 258 Mich App 412, 413-414; 671 NW2d 572 (2003).

The Headlee Amendment, 1963 Const, art 9, § 31, provides:

> Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon. If the definition of the base of an existing tax is broadened, the maximum authorized rate of taxation on the new base in each unit of Local Government shall be reduced to yield the same estimated gross revenue as on the prior base. If the assessed valuation of property as finally equalized, excluding the value of new construction and improvements, increases by a larger percentage than the increase in the General Price Level from the previous year, the maximum authorized rate applied thereto in each unit of Local Government shall be reduced to yield the same gross revenue from existing property, adjusted for changes in the General Price Level, as could have been collected at the existing authorized rate on the prior assessed value.

> The limitations of this section shall not apply to taxes imposed for the payment of principal and interest on bonds or other evidence of indebtedness or for the payment of assessments on contract obligations in anticipation of which bonds are issued which were authorized prior to the effective date of this amendment.

"An application of § 31 is triggered by the levying of a tax." *Jackson Co v City of Jackson*, 302 Mich App 90, 98; 836 NW2d 903 (2013). "Section 31 prohibits units of local government from levying any new tax or increasing any existing tax above authorized rates without the approval of the unit's electorate." *Id.* at 98-99, quoting *Durant v Michigan*, 456 Mich 175, 183; 566 NW2d 272 (1997). Although "a tax imposed without voter approval 'unquestionably violates' § 31 . . . a charge that is a user fee 'is not affected by the Headlee Amendment.'" *Jackson Co*, 302 Mich App at 99, quoting *Bolt v City of Lansing*, 459 Mich 152, 158-159; 587 NW2d 264 (1998). "Generally, a fee is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit. A tax, on the other hand, is designed to raise revenue." *Jackson Co*, 302 Mich App at 99, quoting *Bolt*, 459 Mich at 161.

In *Bolt*, 459 Mich 152, the defendant city of Lansing adopted an ordinance to provide funding for a project separating the defendant's combined sanitary and storm sewers in accordance with environmental legislation. *Id.* at 154-155. The ordinance imposed on each parcel of real property a storm water service charge "using a formula that attempts to roughly estimate each parcel's storm water runoff." *Id.* at 155. The plaintiff challenged the ordinance on the ground that the storm water service charge was a tax enacted without voter approval in violation of the Headlee Amendment. *Id.* at 158. Our Supreme Court "articulated three primary criteria to be considered when distinguishing between a fee and a tax." *Id.* at 161. "The first criterion is that a user fee must serve a regulatory purpose rather than a revenue-raising purpose." *Id.* "A second, and related, criterion is that the user fees must be proportionate to the necessary costs of the service." *Id.* at 161-162. The third criterion is voluntariness. The Court in *Bolt* quoted *Ripperger v City of Grand Rapids*, 338 Mich 682, 686; 62 NW2d 585 (1954), in which the Supreme Court held that water rates paid by consumers were not taxes, because "citizens may take it or not as the price does or does not suit them." *Bolt*, 459 Mich at 162. The Court concluded that the storm water service charge does "not correspond to the benefits conferred" because it did not distinguish between property owners already served by a separated storm and sanitary sewer system. *Id.* at 165. The Court determined that there was a "lack of a significant element of regulation" because if the ordinance "only regulates the amount of rainfall shed from a parcel of property as surface runoff; it does not consider the presence of pollutants on each parcel that contaminate such runoff and contribute to the need for treatment before discharge into navigable waters." *Id.* at 166-167. Finally, the Court concluded that the ordinance failed the criterion of voluntariness because the charge was "effectively compulsory." The property owner had "no choice whether to use the service and is unable to control the extent to which the service is used." *Id.* at 168. The Court held that the charge was a tax subject to the requirements of the Headlee Amendment. *Id.* at 169.

In *USA Cash #1, Inc v City of Saginaw*, 285 Mich App 262; 776 NW2d 346 (2009), the defendant city enacted an ordinance "requiring secondhand merchants to electronically report transactions in which the merchants received secondhand or used personal property to the chief of police within 48 hours of the transaction and pay a fee of $2 for each transaction." *Id.* at 264. The plaintiff merchant argued, *inter alia*, that the two dollar transaction fee was a tax enacted in violation of the Headlee Amendment. *Id.* at 279. This Court addressed the "three primary criteria to be considered when distinguishing between a fee and a tax" in accordance with *Bolt*. *Id.* at 280. This Court held that the ordinance "provides a measure of security to secondhand merchants by ensuring that the merchant is not unknowingly trafficking in stolen property, deterring the attempted pawning of stolen property, and protecting the merchant from extending money in exchange for property that may later be confiscated by the police." *Id.* at 281. Although the regulation benefitted the general public as well as the merchants, this Court remarked that a regulatory fee could have the dual purpose of benefitting the general public without losing its regulatory characterization. *Id.* This Court rejected the plaintiff's argument that the two-dollar transaction fee was disproportionate to the benefit conferred. This Court quoted the trial court's opinion analyzing the distribution of the fee (50 cents returned to the merchant, 50 cents for the electronic data manager's services, and one dollar to the city to defray its expenses), and concluded that the fee, when multiplied by the anticipated annual transactions, would generate approximately $38,000 in revenue, which was "not wholly disproportionate" to the salary and benefits ("in excess of $35,000 per year") of the municipal clerical worker who would process the transaction reports. *Id.* at 281-282. Regarding voluntariness, this Court

-10-

approvingly quoted the trial court's conclusion that the fee was voluntary because the decision to engage in secondhand transactions was a "purely voluntary decision within the complete control of an individual or business." *Id.* at 282. This Court acknowledged that secondhand transactions represented "a primary source of income" for the plaintiff and similarly situated businesses, for which "reducing the number of their transactions or relocating their businesses is impracticable," but still concluded that the fee was a user fee, and not a tax subject to the Headlee Amendment. *Id.* at 283.

The 10-cent (or fifty-cent) surcharge in the instant case is comparable with two-dollar fee in *USA Cash #1*. Plaintiff argues that it did not receive a benefit from the electronic reporting because the primary goal of the ordinance was to improve law enforcement's ability to investigate trafficking in stolen goods. This Court rejected this same argument in *USA Cash #1*. *Id.* at 281. Plaintiff argues that the 10-cent fee is not proportionate to the benefit received. We conclude, however, that the trial court's analysis is consistent with this Court's analysis of the proportionality issue in *USA Cash #1*. In that case, the two-dollar fee was distributed as follows: 50 cents was returned to the dealer, 50 cents was paid toward the electronic data manager's services, and one dollar went to the city to defray its expenses. The city's anticipated annual fee revenue was approximately $38,000. This Court agreed that this figure "is not wholly disproportionate to the salary of the City's clerical worker who receives salary and benefits 'in excess of $35,000 per year' as compensation for reviewing the secondhand merchant reports complied on the database . . . ." *Id.* at 281-282. In the instant case, when the charge was 50 cents per transaction, 23,000 reports annually would net $11,500, on par with the annual LeadsOnline cost of $10,588. The fee has since been reduced to 10 cents for the same service. This data establishes that the amount of the surcharge is proportionate with the benefit received from LeadsOnline's service.

Finally, the trial court's analysis of the voluntariness element is consistent with the analysis in *USA Cash #1*. Like the plaintiff in *USA Cash #1*, plaintiff voluntarily entered the pawnbroker business and voluntarily participates in pawn transactions with customers. Plaintiff argues that it has no choice because its only other option is to forego its owner's livelihood. However, despite this Court acknowledging in *USA Cash #1* that it would be "impracticable" for the dealers to relocate their businesses or curtail their transactions, this Court concluded that this did not negate the voluntariness of the fee. *Id.* at 282-283.

Accordingly, we reject plaintiff's arguments that the LeadsOnline ordinance violates the Headlee Amendment.

## VI. THE FCRA

Plaintiff argues that the LeadsOnline ordinance violates the federal Fair Credit Reporting Act, 15 USC 1681 *et seq*. The FCRA defines the term "consumer report" at 15 USC 1681a(d), as follows:

**(1) In general.**

The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a

consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for –

(A) credit or insurance to be used primarily for personal, family, or household purposes;

(B) employment purposes; or

(C) any other purpose authorized under section 1681b of this title

**(2) Exclusions.**

Except as provided in paragraph (3), the term "consumer report" does not include—

(A) subject to section 1681s-3 of this title, any—

(*i*) report containing information solely as to transactions or experiences between the consumer and the person making the report;

"Consumer reporting agency" is defined as "any person which . . . regularly engages . . . in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties . . . ." 15 USC 1681a(f). 15 USC 1681b governs permissible purposes of consumer reports. 15 USC 1681b(a) provides that a consumer reporting agency "may furnish a consumer report under the following circumstances and no other . . . ." 15 USC 1681b(a)(3) lists consumer activities involving examination of a consumer's credit history, including transactions related to the extension of credit, employment decisions, insurance transactions, licensure applications, investment matters, and child support. None of the permissible purposes enumerated in § 1681b(a)(3) relate to law enforcement oversight of pawnbroker transactions. Additionally, 15 USC 1681f provides:

Notwithstanding the provisions of section 1681b of this title, a consumer reporting agency may furnish identifying information respecting any consumer, limited to his name, address, former addresses, places of employment, or former places of employment to a governmental agency.

Plaintiff argues that the trial court erred in failing to recognize that LeadsOnline's reports to its member law enforcement agency do not meet the exclusion of 15 USC 1681a(d)(2)(A)(*i*) because LeadsOnline does not enter into transactions with the pawnshop customers. This argument blurs the distinction between plaintiff's own mandatory reports to LeadsOnline, and LeadsOnline's reports to its member law enforcement agencies. Plaintiff reports *its own* transactions with customers when it sends reports to LeadsOnline. Therefore, plaintiff's own reports come within the exclusion. More significantly, plaintiff has failed to establish a genuine issue of material fact regarding whether its reports to LeadsOnline, as well as LeadOnline's communications with law enforcement, contain information that "is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the

-12-

consumer's eligibility" for credit, employment, or insurance. There is no suggestion that LeadsOnline or the law enforcement agencies intend to use the information to assess customers' credit worthiness or financial health. The focus of the reports is not on the loan to the consumer, but the article pledged to secure the loan. Plaintiff does not argue that the reports would be used to determine a customer's eligibility for credit, employment, or insurance, and in the absence of any evidence that it would, such arguments would be unripe, and plaintiff's standing to assert them would be questionable. Therefore, we also reject plaintiff's argument that the LeadsOnline ordinance violates the FCRA.

## VII.  THE MICHIGAN PAWNBROKERS ACT

Plaintiff further argues that the LeadsOnline ordinance is preempted by the Michigan pawnbrokers act, MCL 446.201 *et seq.* "Whether a state statute preempts a local ordinance is a question of statutory interpretation and, therefore, a question of law that we review de novo." *Ter Beek v City of Wyoming*, 297 Mich App 446, 452; 823 NW2d 864 (2012).

"State law preempts a municipal ordinance in two situations: (1) where the ordinance directly conflicts with a state statute or (2) where the statute completely occupies the field that the ordinance attempts to regulate." *Czymbor's Timber, Inc v City of Saginaw*, 269 Mich App 551, 555; 711 NW2d 442 (2006), aff'd on other grounds 478 Mich 348 (2007). "A direct conflict exists when the ordinance permits what the statute prohibits or the ordinance prohibits what the statute permits." *Id.*

MCL 446.205 provides, in pertinent part:

> (2) Upon the receipt of any article of personal property or other valuable thing by way of pawn, the pawnbroker shall make a permanent record of the transaction on a form provided by the pawnbroker that substantially complies with the form described in subsection (4). Each record of transaction shall be completed in duplicate by the pawnbroker, legibly in the English language, and shall contain all applicable information required to complete the record of transaction form under subsection (4). *This subsection does not prohibit the use and transmission of the information required in the record of the transaction by means of computer or other electronic media as permitted by the local police agency within the applicable governmental unit.*
>
> (3)  The pawnbroker shall retain a record of each transaction and, within 48 hours after the property is received, shall send 1 copy of the record of transaction to the local police agency.  [Emphasis added.]

The statute further provides that the "record of transaction form shall be 8-1/2 inches by 11 inches in size." The statute sets forth a template for the form. MCL 446.205(4).

In *Ter Beek*, 495 Mich 1, the defendant city amended its zoning ordinance to include a provision prohibiting in all districts uses not expressly permitted. The amendment also provided that "[u]ses that are contrary to federal, state law, or local ordinance are prohibited." *Id.* at 6. By incorporating federal statutory prohibitions, the zoning amendment prohibited selling, using, and producing marijuana in accordance with the federal controlled substances act, 21 USC 801 *et*

*seq*. *Id*. at 5-6, 8-9. The plaintiff held a medical marijuana license pursuant to the Michigan Medical Marijuana Act (MMMA), MCL 333.26421 *et seq*. *Ter Beek*, 495 Mich at 6. The plaintiff filed an action against the defendant city, arguing that the MMMA preempted the zoning amendment. *Id*. The Supreme Court reviewed principles of preemption in regard to a Michigan statute and local ordinance, stating:

> Under the Michigan Constitution, the City's "power to adopt resolutions and ordinances relating to its municipal concerns" is "subject to the constitution and the law." Const 1963, art 7, § 22. As this Court has previously noted, "[w]hile prescribing broad powers, this provision specifically provides that ordinances are subject to the laws of this state, i.e., statutes." *AFSCME v Detroit*, 468 Mich 388, 410; 662 NW2d 695 (2003). The City, therefore, "is precluded from enacting an ordinance if . . . the ordinance is in direct conflict with the state statutory scheme, or . . . if the state statutory scheme preempts the ordinance by occupying the field of regulation which the municipality seeks to enter, to the exclusion of the ordinance, even where there is no direct conflict between the two schemes of regulation." *People v Llewellyn*, 401 Mich 314, 322; 257 NW2d 902 (1977) (footnotes omitted). A direct conflict exists when "the ordinance permits what the statute prohibits or the ordinance prohibits what the statute permits." *Id*. at 322 n 4. Here, the Ordinance directly conflicts with the MMMA by permitting what the MMMA expressly prohibits—the imposition of a "penalty in any manner" on a registered qualifying patient whose medical use of marijuana falls within the scope of § 4(a)'s immunity. [*Ter Beek*, 495 Mich at 19-20.]

In the instant case, there is no direct conflict between the state pawnbrokers act and the LeadsOnline ordinance. The pawnbrokers act does not prohibit electronic reporting, but expressly permits it. Plaintiff emphasizes that the pawnbrokers act does not expressly permit a police department to require electronic transmission of transaction reports, and that it also does not permit a police department to contract with a third-party private vendor. This does not establish a direct conflict, which would only exist if the pawnbrokers act expressly prohibited electronic reporting or third-party vendor inclusion. The state act provides that "[t]his subsection does not prohibit the use and transmission of the information . . . by means of computer or other electronic media *as permitted by the local police agency* . . . ." MCL 446.205(2) (emphasis added). The phrase "as permitted" allows the local police department to determine the scope of permissible electronic transmissions. Defendant here opted to require electronic transmission in lieu of paper reports. Although requiring a specific method facilely appears distinct from permitting that method, the statute grants to the local agency the discretion to choose the extent of the electronic alternative. The "extent" defendant chose was to make electronic reporting the sole and required method. The statute does not require the municipality to leave paper reporting as an option. The statute is silent with respect to designating a third-party private vendor as the police department's agent for receiving and maintaining the reports. Accordingly, there is no conflict, and the LeadsOnline ordinance is not preempted by the pawnbrokers act.

## VIII. PLAINTIFF'S ADDITIONAL ARGUMENTS

Plaintiff raises additional arguments that imposition of a fee payable to a third-party private vendor to support a contractual arrangement that plaintiff does not want is contrary to basic constitutional principles and American values by forcing plaintiff to pay a private entity for a program plaintiff does not wish to participate in. Plaintiff invokes principles of due process and uncompensated proprietary takings and compares the LeadsOnline program to "the despised British tradition of requisitioning property from individuals whenever the Crown needed supplies for the support of its military and naval forces." However, plaintiff does not actually argue that the LeadsOnline ordinance constitutes an unconstitutional taking of property, but instead asserts that the ordinance is "comparable to constitutional limitations on 'takings without just compensation' present in both the United States and Michigan Constitutions." Plaintiff argues that two recent decisions by the United States Supreme Court present issues comparable to the legality of the LeadsOnline mandate, namely *Nat'l Federation of Indep Business v Sebelius*, ___ US ___; 132 S Ct 2566; 183 L Ed 2d 450 (2012), and *Knox v Serv Employees Int'l Union, Local 1000*, ___ US ___; 132 S Ct 2277; 183 L Ed 2d 281 (2012). Although plaintiff maintains that these decisions "visit issues in common with Motor City's situation if The City's Police Department is allowed to implement its LeadsOnline-uploading 'policy,' " plaintiff does not clearly explain why these cases are relevant to this appeal. "An appellant may not merely announce [a] position and leave it to this Court to discover and rationalize the basis for [its] claims, . . . nor may [it] give issues cursory treatment with little or no citation of supporting authority." *Houghton v Keller*, 256 Mich App 336, 339; 662 NW2d 854 (2003). "An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue." *Id.* Our review of the decisions in *Nat'l Federation of Indep Business* and *Knox* fails to reveal their relevance to the LeadsOnline ordinance, and plaintiff's failure to develop any argument explaining their relevance, or to present any rational argument in support of this additional claim of error, precludes further consideration of the issue.

Affirmed.

/s/ Kathleen Jansen
/s/ Mark J. Cavanagh
/s/ Elizabeth L. Gleicher